**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:25-cr-259 |
| v. | 18 U.S.C. § 1349 |
| | Conspiracy to Commit Securities Fraud and |
| YAN ZHAO, | Wire Fraud |
| *also known as* "HANK SHI," | (Count One) |
| *also known as* "HANK SHU," | |
| *also known as* "ALTMAN," | 18 U.S.C. §§ 1348(1) & 2 |
| *also known as* "BOB," | Securities Fraud |
| (Counts One through Four) | (Count Two) |
| and | 18 U.S.C. §§ 1343 & 2 |
| | Wire Fraud |
| LAI KUI SEN, | (Count Three) |
| (Counts One through Four) | |
| | 15 U.S.C. §§ 78j(b) & 78ff(a); 17 C.F.R. § |
| *Defendants.* | 240.10b-5; 18 U.S.C. § 2 |
| | Fraud in Connection with Purchase and Sale |
| | of Securities |
| | (Count Four) |
| | Forfeiture Notice |

FILED
IN OPEN COURT

SEP 1 0 2025

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

**INDICTMENT**

September 2025 Term – At Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

**INTRODUCTORY ALLEGATIONS**

At all times material to the Indictment:

**A. EXECUTIVE SUMMARY**

1.      From at least in or around December 2024, and continuing through in or around

August 2025, YAN ZHAO (also known as "HANK SHI," "HANK SHU," "ALTMAN," and

"BOB") and LAI KUI SEN, the defendants, and their co-conspirators, engaged in a multifaceted

securities and wire fraud scheme involving Ostin Technology Group Co., Ltd. ("OST"), a

Chinese company trading on NASDAQ, which resulted in investor losses of over $110 million. Beginning on or about April 15, 2025, the defendants and their co-conspirators engineered a fraudulent sequence of securities offerings to place the majority of OST shares in the hands of fifteen co-conspirators. These securities offerings were synchronized with a fraudulent campaign to artificially inflate the price and trading volume of the OST stock through social media and messaging service applications, including promotions that impersonated actual investment advisors and financial professionals. In a period of roughly two months, the fraudulent promotional campaign artificially inflated the value of OST from an approximately $22 million company into a greater than $1 billion company by market capitalization. As OST's stock price rose, the defendants facilitated the opening of brokerage accounts on behalf of co-conspirators, which were used to sell the millions of OST shares that were obtained through non-bona fide securities offerings to investors at substantial profit. This fraudulent scheme resulted in members of the conspiracy obtaining more than $110 million in proceeds from the sale of OST stock which victimized unwitting investors. OST investors then suffered significant losses when on June 26, 2025, OST lost over $950 million in market capitalization, representing over 94% of its value, in a single day.

## B. RELEVANT INDIVIDUALS AND ENTITIES

2.    OST was a company incorporated in the Cayman Islands on or about September 26, 2019, with principal executive offices in Nanjing, China, that claimed to be a manufacturer of display modules used in consumer electronics, commercial LCD displays, and automotive displays. Shares of OST were publicly traded on NASDAQ, a national securities exchange, under the symbol "OST." OST was an issuer subject to Section 12 of the Securities Exchange

Act of 1934 (the "Exchange Act") and was required to file reports under Section 13 of the Exchange Act.

3.      Defendant YAN ZHAO held himself out as a financial advisor.  ZHAO utilized various aliases, including "HANK SHI," "HANK SHU," "ALTMAN," and "BOB."

4.      Defendant LAI KUI SEN became the co-Chief Executive Officer ("CEO") of OST in or around January 2025.  Along with SEN, Individual 1 served as the co-CEO of OST.

5.      Co-conspirator ("CC") 1 and CC-4 were Singaporean nationals. CC-2 and CC-3 were Indonesian nationals.  CC-1, CC-2, CC-3, and CC-4 were all eventual investors in OST, and ZHAO at various points purported to be their financial advisor.

6.      Public Company A, Public Company B, and Public Company C were companies incorporated in the Cayman Islands with principal executive offices in China which traded on NASDAQ.  Public Company A purported to be an educational services company, Public Company B purported to be a logistics company, and Public Company C purported to be a healthcare company.

7.      OST, Public Company A, Public Company B, and Public Company C all operated at some point using the variable interest entity ("VIE") investment structure, which was often used by Chinese companies listed on U.S. exchanges.  Rather than purchasing and owning shares of the underlying foreign operating company—which for OST, Public Company A, Public Company B, and Public Company C were all based in China—VIE investors purchased shares in holding companies, which were usually incorporated in the Cayman Islands.

8.      Brokerage Firm 1 was a brokerage firm, an entity that brings together buyers and sellers to facilitate a stock transaction, operating out of New Jersey.  Broker 1 was a registered

broker-dealer with the United States Securities and Exchange Commission ("SEC"), who worked at Brokerage Firm 1.

      9.     Brokerage Firm 2 was a brokerage firm operating out of New York. Brokers 2 through 4 were registered broker-dealers with the SEC, who worked at Brokerage Firm 2.

## C. BACKGROUND ON SECURITIES MARKETS AND REPORTING REQUIREMENTS

      10.     The SEC was an agency within the executive branch of the United States government, which enforced federal securities laws, regulations, and rules governing the public reporting of information about publicly traded companies.

      11.     Under the Exchange Act and other securities laws, regulations, and rules, certain publicly traded companies, and the officers of those companies, had a duty to file with the SEC periodic reports, including financial statements that accurately and fairly reported the companies' financial condition and the results of their business operations.

      12.     The Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system was the primary system for companies and others submitting documents under the Exchange Act. EDGAR's electronic servers were located in the Eastern District of Virginia.

      13.     A "broker" was any person engaged in the business of effecting transactions in securities for the account of others.

      14.     Before accepting certain stock for deposit into a customer's brokerage account, brokers were required to conduct due diligence designed to ensure that the customer's acquisitions of the shares and any potential trades in the shares were consistent with applicable law.

      15.     A "purchase warrant" (often simply called a "warrant") was a financial instrument that gave the holder the right, but not the obligation, to purchase a company's stock at a specific

price (the strike price) within a certain timeframe. It was a type of security issued by a company.

16.    A "prospectus" was a written document that provided all material information about an offering of securities and was the primary sales tool of the issuer and broker-dealers that market the offering for the issuer.

## COUNT ONE
(Conspiracy to Commit Securities Fraud and Wire Fraud)

At all times material to this Indictment, unless stated otherwise, all dates being on or about the date alleged, and all dollar amounts being approximate:

17.    The allegations set forth in the preceding paragraphs of this Indictment, including sub-paragraphs, are re-alleged and incorporated by reference as though fully set forth herein.

18.    From at least in or around December 2024, and continuing through at least on or about August 5, 2025, in the Eastern District of Virginia and elsewhere, the defendants

**YAN ZHAO,**
*also known as* **"HANK SHI,"**
*also known as* **"HANK SHU,"**
*also known as* **"ALTMAN,"**
*also known as* **"BOB,"**

**and**

**LAI KUI SEN**

did knowingly combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury to commit certain offenses against the United States, to wit:

   a.  Securities fraud, that is, to knowingly and intentionally execute a scheme and artifice to defraud any person in connection with any security of OST, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) and that is required to

file reports under Section 15(d) of the Securities Exchange Act of 1934

(15 U.S.C. § 78o(d)), in violation of Title 18, United States Code,

Section 1348(1); and

b. Wire fraud, that is, to knowingly devise and intend to devise a scheme and

artifice to defraud, and to obtain money and property by means of

materially false and fraudulent pretenses, representations, and promises,

did knowingly transmit and cause to be transmitted, by means of wire

communications in interstate and foreign commerce writings, signs,

signals, pictures, and sounds for the purpose of executing such scheme and

artifice, in violation of Title 18, United States Code, Section 1343.

## A. PURPOSE OF THE CONSPIRACY

19.     It was the purpose of the conspiracy for defendants ZHAO and SEN, and other

co-conspirators known and unknown to the Grand Jury, to unjustly enrich themselves and others,

and to obtain money and property from victims by: (a) transferring a majority ownership interest

in OST to co-conspirators through non-bona fide securities offerings in parallel with a

promotional campaign that artificially pumped the price of OST stock; and (b) facilitating co-

conspirators' sale of OST shares at an inflated price.  It was also the purpose of the conspiracy

for defendants ZHAO and SEN, and other co-conspirators, to conceal wrongdoing from the

investing public, regulators, and law enforcement.

## B. MANNER AND MEANS OF THE CONSPIRACY

20.     Beginning at least as early as December 2024, defendants ZHAO and SEN, and

other co-conspirators, agreed to and began a complex scheme that would ultimately steal value

from OST investors and to fraudulently enrich themselves and a group of fifteen investors

(hereafter, the "Select Investors"), including CC-1, CC-2, CC-3, and CC-4. In furtherance of the conspiracy, and to accomplish its unlawful objectives, defendants ZHAO and SEN, and other co-conspirators known and unknown to the Grand Jury, used the following manner and means, among others:

### i.  ZHAO initiated relationships with Brokers 1, 2, 3, and 4.

21.     Beginning in or around December 2024, ZHAO, claiming to be a financial advisor, began cultivating relationships with brokers based in the United States, including Broker 1 and Broker 2. In or around December 2024, Broker 1 met ZHAO in Shenzhen, China. In or about January 2025, Broker 2 met ZHAO while in Hong Kong on a business trip.

22.     On or about January 22, 2025, Broker 2 introduced ZHAO to Broker 3 and Broker 4 through a virtual messaging platform. ZHAO thereafter utilized the virtual messaging platform to monitor trading of his purported clients and to provide instructions regarding trading to Broker 3 and Broker 4. ZHAO then directed sales of his clients' Public Company A and Public Company B stock to Broker 3 and Broker 4, including at or around the time that Public Company A and Public Company B stock prices were crashing.

23.     In or around January 2025, ZHAO also contacted Broker 1 in an attempt to open accounts and transfer the shares of two clients who had participated in a securities offering for Public Company A. Brokerage Firm 1 never received Public Company A shares on behalf of ZHAO's clients.

24.     Thereafter, in or around March 2025, ZHAO introduced Broker 1 to a client who owned Public Company B shares. Broker 1 opened an account at Brokerage Firm 1 in the name of ZHAO's client and initiated a transfer of the Public Company B shares into this account. In or around April 2025, Public Company B's stock price crashed.

ii. *SEN and other co-conspirators initiated a non-bona fide securities offering to dilute ownership interests of retail and institutional investors.*

25.    By in or around April 2025, OST's shares were in decline. On or about April 14, 2025, OST shares hit a low of approximately $0.78 per share, which was the 52-week low for the stock as of that date.

26.    On or about April 15, 2025, while the stock was trading at low prices, SEN and his co-conspirators initiated a non-bona fide securities offering involving OST. SEN and Individual 1 signed a securities purchase agreement on behalf of OST that provided "directly to several investors" 9,090,908 Class A ordinary shares and Class A ordinary share purchase warrants to purchase up to 90,909,080 Class A ordinary shares—all in exchange for a total of $5 million paid by the Select Investors (hereafter, the "registered direct offering" or "RDO").

27.    Under the RDO, the Select Investors obtained OST shares at a deep discount relative to the market price at the time, with the option of purchasing additional shares at an even greater discount through warrant exercises. For instance, under one scenario contemplated by the RDO, the Select Investors could obtain millions of shares at an average per-share cost of approximately $0.195, which represented an extreme discount from OST's closing price of $0.80 on or about April 14, 2025, the date the RDO was finalized.

28.    OST notified the investing public of the RDO on or about April 15, 2025, by issuing a press release and filing with the SEC, via EDGAR, a supplement to the Prospectus discussing the RDO ("Prospectus Supplement"). The Prospectus Supplement was materially misleading by omitting facts material to the investing public, including, among other things, that SEN, CC-1, CC-2, CC-3, CC-4, and other Select Investors were conspiring on the receipt and subsequent sale of OST shares obtained through this offering during a campaign to artificially

inflate OST's stock price. This electronic filing of the Prospectus Supplement on EDGAR caused a wiring between the Eastern District of Virginia and servers outside of Virginia.

29.     The day after the RDO, on or about April 16, 2025, SEN and Individual 1 signed a SEC Form 6-K, which OST filed and caused to be filed with the SEC, via EDGAR, and which, among other things: (a) announced that OST entered into the RDO; and (b) provided a copy of the April 15, 2025 press release to the SEC. The SEC filing was materially misleading by omitting facts material to the investing public, including the same material omission from the Prospectus Supplement, discussed above. This SEC filing caused an interstate wiring between the Eastern District of Virginia and servers outside of Virginia.

30.     Between on or about April 15, 2025 and continuing through on or about May 3, 2025, none of the Select Investors elected to exercise even a single purchase warrant, despite the fact that exercising these purchase warrants would have allowed the Select Investors to earn substantial profits by purchasing OST shares at a steep discount relative to the market price and to sell those shares at significantly higher prices.

> ### iii.     SEN executed a non-bona fide warrant exchange agreement to even further advantage the Select Investors at the expense of the investing public.

31.     On or about May 3, 2025, SEN, Individual 1, and each of the Select Investors executed a subsequent "Warrant Exchange Agreement," which further diluted OST's preexisting shareholders and ultimately gave the Select Investors millions of OST shares at no pecuniary cost.

32.     Between the RDO and the Warrant Exchange Agreement, the Select Investors were able to obtain 79,999,990 Class A ordinary shares of OST at an approximate cost of $0.0625 per share, well below OST's approximately $3.12 closing price on May 2, 2025, the last

trading day before the date of the Warrant Exchange Agreement. Taken together, the RDO and Warrant Exchange Agreement raised the total number of outstanding Class A ordinary shares of OST from approximately 27.4 million shares to approximately 107.4 million shares. Through these offerings, the Select Investors became owners of approximately 75% of the outstanding Class A ordinary shares of OST.

33.     Despite granting the Select Investors, including CC-1, CC-2, CC-3, and CC-4, the vast majority of OST shares at a fraction of the market price, the terms of the RDO and Warrant Exchange Agreement did not impose any restrictions—such as a stock vesting period or a lock-up period—on the Select Investors' ability to trade their OST shares. Consequently, the Select Investors could sell their shares upon receipt.

34.     On or about May 12, 2025, SEN and Individual 1 signed a SEC Form 6-K, disclosing to the SEC the signed Warrant Exchange Agreement, and OST filed and caused to be filed the same with the SEC, via EDGAR. The filing was materially misleading by omitting facts material to the investing public, including, among other things, that (a) SEN, ZHAO, CC-1, CC-2, CC-3, CC-4, and other Select Investors were conspiring on the receipt and subsequent sale of OST shares obtained through the RDO and the Warrant Exchange Agreement during a campaign to artificially inflate OST's stock price; and (b) ZHAO and SEN were conspiring to assist co-conspirators with setting up brokerage accounts to eventually dump OST shares obtained as part of the RDO and Warrant Exchange Agreement, as discussed below. This SEC filing caused an interstate wiring between the Eastern District of Virginia and servers outside of Virginia.

35.     The RDO and Warrant Exchange Agreement operated as deceptive devices that were used in furtherance of the conspiracy.

#### iv. *OST's non-bona fide securities offerings were synchronized with a fraudulent promotional campaign to increase OST's stock price.*

36.     At least as early as on or about April 15, 2025—the same day that OST publicly announced the RDO and the Select Investors received their first tranche of OST shares—a fraudulent campaign to promote OST and increase its stock price began.

37.     The promoters recruited retail investors through social media and induced them to join WhatsApp chat groups. Throughout these WhatsApp chats, the promoters falsely and misleadingly impersonated actual investment advisors and financial professionals, among others, advocating for the retail public to purchase OST shares.

38.     To induce retail investors to purchase OST, promoters promised extravagant and guaranteed returns (*e.g.*, between 80% to 150% returns within weeks) and used pressure tactics to induce OST stock purchases. For example, promoters pressured retail investors to send screenshots of their brokerage accounts reflecting the purchase of OST shares in the WhatsApp group. If such investors did not "post their positions" in the chats or raised concerns about OST, promoters removed the retail investors from the WhatsApp group to maintain the appearance of consensus. Promoters further created the false impression of buying momentum among retail investors in the WhatsApp chats.

39.     As a result of the promotional campaign, between on or about April 14, 2025, and on or about June 26, 2025, OST's stock price increased 1,075% from a closing price of $0.80 on April 14, 2025, to a peak price of $9.40 on June 26, 2025. This price increase occurred despite the significant dilution of shares following the issuance of 79,999,990 Class A ordinary shares to the Select Investors. Dilutive offerings of this nature typically depress the stock price, but due to the fraudulent campaign, OST's stock price increased dramatically.

40.     During the period of drastic price increase, OST did not announce any significant

news events that would typically result in a sharp increase in a company's stock, such as a strong

earnings announcement or merger announcement.

41.     On or about June 26, 2025, the OST stock price dropped from its peak ($9.40 per

share) to close the day at $0.55 per share. In other words, the market capitalization of OST

dropped by over $950 million in a single day, a greater than 94% reduction. As a result,

defendants ZHAO and SEN, and other co-conspirators, caused substantial financial losses to

victims.

### v. *ZHAO and SEN facilitated CC-1 and CC-2's opening of accounts at Broker 1 in order to sell OST stock during the fraudulent promotional campaign.*

42.     Sometime after April 15, 2025, ZHAO directly introduced Broker 1 to CC-1 and

CC-2, for the purpose of having Brokerage Firm 1 open brokerage accounts in their names.

ZHAO stated that CC-1 and CC-2 had OST shares and warrants they wanted to deposit at

Brokerage Firm 1. As part of the account opening process, Broker 1 requested a formal

introduction letter from a representative of OST for due diligence, given that the transferred OST

shares were at the time worth millions of dollars. Broker 1 asked ZHAO if he knew anyone from

OST's management team who could confirm that CC-1 and CC-2 were investors. ZHAO told

Broker 1 to expect contact from the OST co-CEO.

43.     Sometime after corresponding with ZHAO, Broker 1 received an email from

SEN, who confirmed that CC-1 and CC-2 were shareholders of OST.

44.     Between on or about April 24, 2025, and on or about April 25, 2025, CC-1 and

CC-2 submitted multiple account opening applications to Brokerage Firm 1.

45.     On or about April 25, 2025, in consultation with ZHAO, SEN contacted Broker 1 to get Brokerage Firm 1 to open brokerage accounts for CC-1 and CC-2. Specifically, SEN sent an email to Broker 1 stating, "[CC-2] and [CC-1] are both take part into [*sic*] registed [*sic*] direct offering of my company Ostin Technology Ltd. Both guy's [*sic*] shares is non restricted. Here I recommend them to open brokerage account at your side. Please proceed it. If you have any additional question [*sic*] please let me know."

46.     After receiving SEN's email, on or about April 25, 2025, Brokerage Firm 1 opened a brokerage account ending in -9254 in the name of CC-2 (hereafter, the "CC-2 Account"). On or about April 28, 2025, Brokerage Firm 1 opened a brokerage account ending in -2477 in the name of CC-1 (hereafter, the "CC-1 Account").

47.     Thereafter, ZHAO told Broker 1 that CC-1 and CC-2 had received new OST shares from the Warrant Exchange Agreement. Broker 1 asked ZHAO to have an OST representative send Broker 1 the total number of OST shares outstanding. After Broker 1 contacted ZHAO, SEN sent an email to Broker 1 on or about May 12, 2025, stating: "Out *[sic]* company now outstanding share *[sic]* is 108,130,032. Please see screenshot from transfer agent. Any question please let me know without any hesitate *[sic]*."

48.     As part of their due diligence, Broker 1 later asked for confirmation that CC-1 and CC-2 were not affiliated persons of OST—*e.g.*, officers, directors, or greater than 5% shareholders in OST. On or about June 2, 2025, well into the fraudulent campaign to increase the OST share price, SEN wrote to Broker 1 by email that CC-1 and CC-2 were not affiliated with OST.

49.     In repeatedly working together to allay Broker 1's concerns about CC-1 and CC-2's accounts, ZHAO and SEN conspired to create the financial infrastructure to receive the proceeds of fraud and effectuate the securities and wire fraud scheme.

### vi. *ZHAO initiated OST trades on behalf of CC-1 through CC-4 as the OST share price artificially inflated and after the share price dumped.*

50.     CC-3 and CC-4 opened accounts with Brokerage Firm 2, and ZHAO served as their purported financial advisor. Specifically, on or about January 21, 2025, CC-3 submitted an application to open a brokerage account at Brokerage Firm 2. Brokerage Firm 2 opened a brokerage account ending in -011X in the name of CC-3 (hereafter, the "CC-3 Account"). On or about April 29, 2025, CC-4 submitted an application to open a brokerage account at Brokerage Firm 2. Brokerage Firm 2 opened a brokerage account ending in -711X in the name of CC-4 (hereafter, the "CC-4 Account"). Subsequently, CC-3 and CC-4 transferred their OST shares into the CC-3 Account and CC-4 Account, respectively.

51.     After the OST shares for CC-1, CC-2, CC-3, and CC-4 were successfully transferred to Brokerage Firm 1 and Brokerage Firm 2, ZHAO thereafter repeatedly communicated with brokers at the respective brokerage firms with respect to the sale of OST shares. For example:

    a.   On or about May 2, 2025, ZHAO and CC-4 deposited the 363,636 OST shares obtained via the RDO into the CC-4 Account. ZHAO and CC-4 thereafter initiated the sale of all 363,636 shares on or about May 12, 2025, with proceeds totaling approximately $1,509,089.

    b.   On or about May 5, 2025, ZHAO and CC-1 deposited the 363,636 OST shares obtained via the RDO into the CC-1 Account. ZHAO and CC-1

thereafter initiated the sale of all 363,636 shares on or about May 12, 2025, with proceeds totaling approximately $1,495,137.

c. On or about May 5, 2025, ZHAO and CC-2 deposited the 436,364 OST shares obtained via the RDO into the CC-2 Account. ZHAO and CC-2 thereafter initiated the sale of all 436,364 shares on or about May 12, 2025, with proceeds totaling approximately $1,770,596.

d. On or about May 9, 2025, ZHAO and CC-3 deposited the 854,545 OST shares obtained via the RDO into the CC-3 Account. ZHAO and CC-3 thereafter initiated the sale of all 854,545 shares between on or about May 12, 2025, and on or about May 16, 2025, with proceeds totaling approximately $3,600,716.

52.     After the sale of all the RDO-obtained shares on behalf of CC-1, CC-2, CC-3, and CC-4, ZHAO and other co-conspirators continued selling OST shares obtained as part of the Warrant Exchange Agreement as the artificial pump of the OST share price continued. For example:

a. On or about May 13, 2025, ZHAO and CC-1 deposited the 2,836,361 OST shares obtained through the Warrant Exchange Agreement into the CC-1 Account. Between on or about May 15, 2025, and continuing through on or about June 10, 2025, ZHAO and CC-1 sold 2,027,134 of these shares, with proceeds totaling approximately $10,117,023. When combined with the sale of the RDO shares, the proceeds from the sale of approximately 75% of CC-1's OST position totaled $11,612,160 during the period in which the stock was artificially inflated. ZHAO and CC-1 sold the

remaining 809,227 shares after the drop in OST's stock price and received

approximately $372,438 from these sales, bringing the total proceeds from

the sale of the OST position to approximately $11,984,598.

b. On or about May 16, 2025, ZHAO and CC-3 deposited the 6,665,451 OST

shares obtained through the Warrant Exchange Agreement into the CC-3

Account. ZHAO and CC-3 then sold 3,908,616 shares between on or

about May 19, 2025, and on or about June 24, 2025. The sales of these

shares resulted in total proceeds of approximately $23,749,959.

53.     With most of the proceeds of the OST stock sales, ZHAO and his co-conspirators

purchased Treasury ETFs and transferred these securities out of the United States to a brokerage

firm in Hong Kong. To facilitate these transfers, CC-1, CC-2, CC-3, and CC-4 provided to

Brokerage Firm 1 and Brokerage Firm 2 account statements for their Hong Kong-based

brokerage account covering the time period of April 1, 2025, to April 30, 2025. CC-1, CC-2,

CC-3, and CC-4 had virtually the same account balances in their Hong Kong-based brokerage

accounts during the same period of time.

54.     Co-conspirators continued to try to sell OST shares, even after the OST share

price crashed on June 26, 2025.

### vii. After dumping OST shares, ZHAO pivoted to a scheme to profit from the inflation of Public Company C's stock.

55.     On or about June 26, 2025, the same day OST's stock price collapsed, ZHAO

joined a virtual messaging platform with Broker 3 and Broker 4 entitled [Public Company C's

symbol]. Thereafter, ZHAO facilitated Public Company C trading activity at Brokerage Firm 2

on behalf of a purported client. The Public Company C stock crashed on or about July 29, 2025

by approximately 95%.

* * *

56.    On or about July 18, 2025, OST announced a reverse share split in which every twenty-five OST Class A ordinary shares would be combined into a single OST Class A Ordinary Share. After approval by the Company's shareholders on July 17, 2025, this change took effect on August 5, 2025, resulting in the OST stock price going above $1.00 per share, a NASDAQ threshold beneath which companies were frequently delisted.

57.    In all, members of the conspiracy fraudulently obtained over $110 million in proceeds from the scheme, which represented money stolen from other investors in OST.

(All in violation of Title 18, United States Code, Section 1349).

## COUNT TWO
(Securities Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

58.    The allegations set forth in paragraphs 1-16 and 19-57 are re-alleged and incorporated by reference as though fully set forth herein.

59.     From at least in or around December 2024, and continuing through at least on or about August 5, 2025, in the Eastern District of Virginia and elsewhere, the defendants

**YAN ZHAO,**
*also known as "HANK SHI,"*
*also known as "HANK SHU,"*
*also known as "ALTMAN,"*
*also known as "BOB,"*

**and**

**LAI KUI SEN**

did knowingly and intentionally execute a scheme and artifice to defraud any person in connection with any security of OST, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) and that is required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)).

(In violation of Title 18, United States Code, Sections 1348(1) and 2).

### COUNT THREE
(Wire Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

60.     The allegations set forth in paragraphs 1-16 and 19-57 are re-alleged and incorporated by reference as though fully set forth herein.

61.    On or about the date below, in the Eastern District of Virginia and elsewhere, the

defendants

**YAN ZHAO,**
*also known as "HANK SHI,"*
*also known as "HANK SHU,"*
*also known as "ALTMAN,"*
*also known as "BOB,"*

**and**

**LAI KUI SEN**

to knowingly devise and intend to devise a scheme and artifice to defraud, and to obtain money

and property by means of materially false and fraudulent pretenses, representations, and

promises, did knowingly transmit and cause to be transmitted, by means of wire communications

in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose

of executing such scheme and artifice, as set forth below:

| Count | On or About Date | Description of Wire |
|-------|------------------|--------------------|
| 3 | May 12, 2025 | SEN signed an SEC Form 6-K, announcing OST's Warrant Exchange Agreement with the Select Investors, which OST filed with the SEC, via EDGAR. This SEC filing caused an interstate wiring between the Eastern District of Virginia and servers outside of Virginia. |

(In violation of Title 18, United States Code, Sections 1343 and 2).

### COUNT FOUR
(Fraud in Connection with Purchase and Sale of Securities)

THE GRAND JURY FURTHER CHARGES THAT:

62.    The allegations set forth in paragraphs 1-16 and 19-57 are re-alleged and

incorporated by reference as though fully set forth herein.

**The Scheme to Defraud**

63.    From at least in or around December 2024, and continuing through at least on or about August 5, 2025, within the Eastern District of Virginia and elsewhere, the defendants

**YAN ZHAO,**
*also known as* **"HANK SHI,"**
*also known as* **"HANK SHU,"**
*also known as* **"ALTMAN,"**
*also known as* **"BOB,"**

**and**

**LAI KUI SEN**

did knowingly and willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and facilities of NASDAQ, in connection with the purchase and sale of securities, used and employed, and cause others to use and employ, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing, and causing others to employ, devices, schemes, and artifices to defraud; and (c) engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon the market, including investors and potential investors in OST.

64.    The scheme to defraud operated, in substance, as described in paragraphs 1-16 and 19-57 of this Indictment.

**Execution of the Fraudulent Scheme**

65.    On or about the May 12, 2025, in the Eastern District of Virginia and elsewhere, for the purpose of executing the scheme to defraud described above, defendants ZHAO and SEN directly and indirectly caused the use of a means and instrumentality of interstate commerce and the facilities of NASDAQ, in connection with the purchase and sale of securities by filing and

causing the filing of a SEC Form 6-K, signed by SEN and announcing OST's Warrant Exchange Agreement with the Select Investors, with the SEC, via EDGAR.

(In violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2).

## FORFEITURE NOTICE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE FOR FORFEITURE AS
DESCRIBED BELOW:

Pursuant to Federal Rule of Criminal Procedure 32.2(a), defendants YAN ZHAO (also
known as "HANK SHI," "HANK SHU," "ALTMAN," and "BOB") and LAI KUI SEN are
hereby notified that:

If YAN ZHAO (also known as "HANK SHI," "HANK SHU," "ALTMAN," and "BOB")
is convicted of the conspiracy offense alleged in Count One, the securities fraud offense alleged
in Count Two, or the wire fraud offense alleged in Count Three, he shall forfeit to the United
States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United
States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from
proceeds traceable to the offense.

If LAI KUI SEN is convicted of the conspiracy offense alleged in Count One, the
securities fraud offense alleged in Count Two, or the wire fraud offense alleged in Count Three,
he shall forfeit to the United States, pursuant to Title 18, United States Code, Section
981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal,
which constitutes or is derived from proceeds traceable to the offense.

The assets subject to forfeiture include, but are not limited to, the following:

a.  a money judgment in the amount the defendants obtained from the wire and securities
fraud scheme;

b.  53,800 shares of USFR, a Treasury ETF seized from Brokerage Firm 2 Account
ending in -011X;

c. 39,500 shares of TFLO, a Treasury ETF seized from Brokerage Firm 2 Account ending in -011X;

d. 37,100 shares of SHV, a Treasury ETF seized from Brokerage Firm 2 Account ending in -011X;

e. $466,454.24 in cash seized from Brokerage Firm 2 Account ending in -011X;

f. $6,158.78 in cash seized from a Brokerage Firm 2 Account ending in -711X;

g. $449,315.57 in cash seized from a Brokerage Firm 1 Account ending in -2477; and

h. $30,221.90 in cash seized from a Brokerage Firm 1 Account ending in -9245.

Pursuant to 21 U.S.C. § 853(p), defendants YAN ZHAO (also known as "HANK SHI," "HANK SHU," "ALTMAN," and "BOB") and LAI KUI SEN shall forfeit substitute property, if, by any act or omission of defendants YAN ZHAO (also known as "HANK SHI," "HANK SHU," "ALTMAN," and "BOB") and LAI KUI SEN, the property referenced above cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

(All pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code Section 2461(c); Title 21, United States Code, Section 853(p); and Federal Rule of Criminal Procedure 32.2).

A TRUE BILL:

Pursuant to the E-Government Act, The original of this page has been filed under seal in the Clerk's Office.

FOREPERSON

LORINDA I. LARYEA
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

Kashan K. Pathan
Trial Attorney

ERIK S. SIEBERT
UNITED STATES ATTORNEY

Avi Panth
Assistant United States Attorney